## William H. Strickland v. E. B. Isett and D. L. Wray, trading as Isett & Wray, Appellants.

*Contract—Parol contract—Evidence.*

In an action of assumpsit to recover damages for the breach of an alleged parol contract, it appeared that the plaintiff had entered into a written contract to cut and deliver timber and bark for the defendants. He alleged that the oral agreement was made at the time the written agreement was executed, and that under it the defendants were to furnish the necessary capital to carry out the written contract. The evidence showed that the defendants paid more for several years in their monthly payments to the plaintiff than the written contract called for. Plaintiff alleged that defendants had refused to make the advancements provided for by the alleged parol agreement, and that in consequence he was unable to carry out the written contract. Plaintiff's evidence as to the existence of the parol agreement was not supported by the testimony of any other witness, and was contradicted by both defendants and a third witness. *Held*, that the evidence as to the existence of the alleged oral agreement was insufficient to submit to the jury.

Argued Oct. 19, 1897. Appeal, No. 74, October Term, 1897, by defendants, from judgment of C. P. Indiana County, March Term, 1895, No. 209, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Reversed.

Assumpsit to recover damages for the breach of an alleged parol agreement. Before WHITE, P. J.

The facts appear by the opinion of the Supreme Court, and by portions of the charge of the court below as follows:

Mr. Strickland agreed that he would cut and deliver in the dam all the timber standing, lying and being on and upon the aforesaid sixteen tracts of land; "that he will cut, peel, cure,

haul and deliver in cars on the siding to be built for the accommodation of this operation all the bark of marketable value being on said tract; that he will cut and deliver said timber and bark in such quantity as Isett & Wray may desire, and at such parts and places of such tracts as they may direct, and in a way and manner satisfactory to them;" . . . . for which he was to receive $3.00 per thousand feet for oak and cherry; $2.50 per thousand for other timber, and $3.00 per ton of two thousand pounds for the bark. Now that is plain. Strickland further agrees, and bear in mind these provisions, "to make, build and furnish at his own cost and charges the roads, bridges, tramways, slides, splash dams, railroad crossings, other than those provided for in the agreement of Irvin Brothers on the C. and J. railroad," . . . . Then, reading it straight along, "all roads railroad crossings, trucks, tools, teams, forces and material, except such as hereinafter provided for." . . . . Then, on the part of Isett & Wray, they said, in consideration of the faithful performance of the foregoing on the part of said Strickland, said Isett & Wray covenant, promise and agree to pay him the said prices. . . .

No complaint, as we understand it, is made by the plaintiff for any breach by the defendants of this written contract. But it is contended by the plaintiff, and this brings us to the matters in dispute, that what is called a contemporaneous parol contract was made by the defendants with him at the time the written contract was made and signed, which induced him to sign the written agreement, and that that parol or verbal contract is such that it ought to be written in the contract itself. . . .

The plaintiff alleges and has testified, substantially, thus : " I made the parol agreement with Isett & Wray on May 21, 1889, . . . . at Sidney, Banks township, this county, on the Northeastern railroad. Mr. Jonathan Glunt, Mr. Wray and myself were present when that agreement was made. Mr. Isett was not there. The parol agreement was, Mr. Wray was to furnish the capital to open up the woods, build tramroads, build camps, pay the men for their labor on the contract and if he didn't do that why him and me couldn't talk in regard to the contract, for I was not able to do so at the time. That was stated at the time. I made that statement knowing that I was not able to

build those immense tramroads, clean out the runs, build the dams, build the camps and carry on that contract the way I supposed those people would require. I considered myself able as far as understanding the business, but I hadn't the capital to do it. I told Mr. Wray I hadn't the capital. I went up there at Mr. Glunt's request from Bellwood. Mr. Glunt and Mr. Wray went with me to this timber tract. When I told Mr. Wray that I would have to be furnished with the capital he said he expected to do that. The other part of the written agreement was talked about, what I was to be paid and so on. I put it down on a piece of envelope I had in my pocket. The prices were the same as were afterwards written in the agreement; there was nothing different, only they have not in the agreement what they agreed in the parol that they would furnish this capital. Mr. Wray said he would advance the money for the improvements, building the tramroads, furnishing trucks, building camps, the necessaries to carry on the contract with; the men were to be paid monthly by my pay roll, by him charging me with the same. I was to make out the pay roll. I am sure that was all noted down that day out in the woods. The contract was written at Bellwood, at the house of D. L. Wray. He prepared it. It was prepared on May 24, and signed along in the afternoon. I believe Mr. Isett, Mr. Wray's partner, was there that day. When the written contract was prepared, we hadn't time to read it over for I wanted to make the train, and it was signed there without reading it over. Mention was made that day about improvements and the pay rolls. Mr. Isett asked me in regard to the case, how much money it would take to open up the woods. I told him between $20,000 and $30,000, or if they allowed me to go handy to the mill it would take less; if they drove me over the tracts to the extreme end on the south branch would take more. And he asked me, also, how long it would take to pay this indebtedness back, and I told them it would depend upon themselves a great deal in putting a mill there capable of manufacturing lumber; the more it manufactured the quicker they would get their money back. Both Isett and Wray said the money would be forthcoming. I mentioned that to them when I was asked to sign the agreement. I told them I hadn't the capital, just as I had in the woods with Mr. Wray. They told me it was all right,

that they would furnish it. They said they would furnish the money, provisions, feed, whatever was necessary to carry on business with, tools; I was to make the pay rolls out and they were to pay the men. I talked that over to them before that written agreement was signed that day. I made this oral agreement with them that day just shortly before we executed the written agreement. Everything was positively understood. When Mr. Isett was asking me about the money, the arrangement was that I was to pay it back as fast as I could earn it; I was not to use any of that money if I earned any; each and every year they were to realize whatever I had coming on this indebtedness. There was no definite amount. Whatever was due me at the settlement was to go as a credit to these improvements until I got them paid. That was discussed that day. Mr. Wray was present when it was talked over. If there was anything due me at the end of the year it was to be applied to the indebtedness until the improvements were paid for. Isett & Wray did advance the money to make the improvements and they paid the pay rolls for five years and over. I made out a few of the pay rolls and Mr. J. A. Antes made the others. Isett & Wray furnished all the money that was necessary for making the improvements up to October 31, 1894, for the camps, tramroads, slides, skidways, trucks, horses, store goods, provisions, and paid the hands; paid all the pay rolls." Now, that is substantially the testimony of Mr. Strickland.

Mr. Antes testifies: " Q. State whether or not you had a conversation with Mr. Wray after you took charge of Mr. Strickland's men in regard to the contract. A. The conversation with Mr. Wray was a few days before I took charge of the contract; was on June 8, I believe. Q. Where did you have the conversation? A. I had the conversation at the place where we camped, near by where their mill is located now; probably sixty rods from where camp No. 1 is. Q. State whether or not you were directed by Mr. Strickland to take charge of the work. A. I was directed by Mr. Strickland to take charge of his work, and when I was there ready to begin I went to Mr. Wray and asked him if there had been any arrangements in regard to him furnishing tools for this contract, and he told me he had made arrangements for the contract. Q. State with whom he said he had made arrangements.

A. He didn't say with whom. Q. State what Mr. Wray did in pursuance of that conversation. A. He gave me a couple of axes and a couple of handles and directed me to make an order and bill of what I wanted to begin work. Q. A bill of what you wanted? A. Yes, sir; of tools. Q. State whether you did make out an order or bill for what was needed. A. I did. Q. To whom did you deliver that order or bill? A. Mr. Wray. Q. State whether or not that order or bill was filled. A. It was. Q. What did Mr. Wray say he was to furnish, if anything? A. He didn't say anything in particular; he just stated he had made arrangements to furnish for the contract. Q. State what you received after that order. A. I received a crosscut saw, some spuds, axes, etc. In 1893, I believe in January, about a year prior to the settlement, Mr. Wray told me he had furnished a large amount of money in making those improvements, and that he was anxious to get a settlement with Mr. Strickland, as the improvement was pretty well all made, the most costly part of it, and that he would like to get a settlement in order that he could show his partner how much money Mr. Strickland could pay back on that each year. That conversation was in Isett & Wray's office."

Now, gentlemen, that is substantially Mr. Strickland's claim as to the alleged parol agreement. . . . The testimony relied upon by the plaintiff is the testimony of the plaintiff himself, the alleged conversation between Mr. Wray and Mr. Antes and the fact that the money was paid from time to time on the pay rolls. Then, again, there is another matter. Here is the letter of June 3, 1892, which is claimed by the plaintiff to be corroboration of Mr. Strickland. This was in 1892, less than three years after the contract was made, and we will read it: "Some of your men seem to feel that in addition to the assurance that their wages will be paid to the last cent every month we should either keep a first national bank right here, or pay them a bonus for accepting our check, when they made demands upon us any hour of the day or any day of the month. We have had quite enough of this and hereby give notice that we will bring money here once a month to pay your men as per your orders, at any day in the month that suits you and your men best. Other than this, except in cases of death or discharge, we will certify your orders good on pay day, and they

may get the money for the statement where they can. Respectfully, Isett & Wray."

Now, gentlemen, we remark furthermore, that it seems there was a settlement between the parties on March 15, 1894, up to January 1, 1894, and an indebtedness admitted, signed by Mr. Strickland, of $16,445.70. The plaintiff presents, also, as evidence that money was furnished by them and a large balance was owing at that time. It is a question for you whether or not that is corroboration of the alleged parol agreement. We have thus tried to mention all the items and circumstances and matter relied upon by the plaintiff as corroboration of Mr. Strickland of the alleged parol agreement. Inasmuch as this is an important feature of the case, we will speak of the other side now.

The defendants entirely deny the making of such parol agreement. . . . Mr. Isett testifies, "On May 24, 1889, Mr. Strickland, Mr. Wray and myself were at Bellwood, at Mr. Wray's office, from a little after one o'clock until pretty well in the evening. We had met there for the purpose of making this agreement, as Mr. Strickland had requested it that afternoon. That is the agreement between Mr. Strickland and ourselves for the doing of the work at our lumber job at Sidney. There was an agreement made that afternoon. I signed my name, Mr. Wray signed his, and Mr. Strickland signed his there. Mr. Wray wrote the agreement. The agreement had been written off in parts by Mr. Wray and read to us there by Mr. Wray and any part there was any objection to was afterwards corrected, and when we got it all together why we all agreed that was about what it ought to be or what we wanted it, and it was written out then by Mr. Wray and signed by us. It was read before it was written, in the pieces; afterwards those pieces were read and we supposed put together by Mr. Wray; and he afterwards read it altogether and signed by the three of us. Q. Mr. Strickland has stated here in his examination that before he signed that agreement he stated in substance you would have to advance money for him to open up the forests, etc., to the amount of twenty to thirty thousand dollars; state whether or not you heard any such statement as that. A. No, sir; I would not have had it; I would not agree to it. Q. When did you first hear of that? A. The first I have heard of that was

since I have come into this courtroom. Q. Mr. Isett, state
whether or not there was any other agreement between Isett &
Wray and W. H. Strickland than the written agreement.
A. I know of none."

Then, in this behalf, Mr. Wray testifies : "I did the clerical
work on this agreement at my home in Bellwood on May 24,
1889. We met in the house shortly after dinner, sat down and
discussed the matter a little and understood each other. I
wrote the points down while Mr. Strickland and Mr. Isett talked.
I read to them what I had, and they made suggestions of im-
provement or amendment. I read over several times as far as
I had gotten, and when it was finally completed, read it over in
full and we signed it. The sections were written upon a whole
paper and the final paper was signed as the agreement. The
agreement that was finally signed was read in the presence of
all from beginning to end before it was signed. . . . I was at
Sidney on May 21, 1889 ; Jonathan Glunt and Mr. Strickland
were there. There was no such utterance there by Mr. Strick-
land, in the presence of myself and Jonathan Glunt, that no
contract could be executed by him unless we would advance
him sufficient funds to open up the ground to the amount of
twenty-five to thirty thousand dollars and that we agreed to
it. I never saw the envelope on which Mr. Strickland says he
made the memorandum. There was no such memorandum
made in my presence that I noticed. I didn't see him have a
memorandum on May 24, 1889. He did not exhibit anything
of that kind. There was no reference made May 24, to any
other conversation between us concerning the agreement than
such as was taking place there at Bellwood. There was no
other agreement made at that time but the written agreement."

Now, gentlemen, that, on the question of the alleged parol
contract, is substantially the testimony of the defendants ; the
testimony of Mr. Isett, testimony of Mr. Wray, the testimony
of Mr. Glunt. Now, how was this? If the evidence is not
such as to satisfy you there was a parol contract such as set up
by the plaintiff your duties end, for this action is not brought
for a violation of the written agreement, as we have said, but
to recover for an alleged breach of the alleged parol agreement.
If there was no parol agreement made as contended for by the
plaintiff, that is the end of the case, as we have said. [If you

find there was no parol agreement made, if the evidence does not come up to the standard that we have indicated, clear, precise and indubitable to satisfy your minds that it was made, then, of course, your verdict must be for the defendants. If you are satisfied there was a parol agreement made, then there are further matters to inquire about.] [2]

Defendants' points and the answers thereto among others were as follows:

1. The plaintiff having stated for his cause of action a breach of an alleged parol agreement, contemporaneous with the written contract made between the parties, and having failed to establish the existence of such parol agreement by competent testimony, and there being no evidence of any breach of the written contract, the plaintiff cannot recover, and the verdict must be for the defendants. *Answer:* This point is refused subject to the principles stated in that behalf in our general charge. [4]

2. Before the written agreement, made May 24, 1889, can be altered, modified or changed by any alleged contemporaneous oral agreement, such oral agreement must be established by proof which is clear, precise and indubitable, and must be such as to warrant the jury in finding that the facts alleged by the plaintiff concerning such parol agreement, are definitely and distinctly established and such proof must carry clear conviction to the mind of the court, that if the facts alleged by the plaintiff are true the matter in issue is distinctly and definitely established, and there being no such proof in this case, the verdict must be for the defendants. *Answer:* While the rule of evidence sufficient to alter, change or modify a written agreement is correctly stated in the point, we cannot say that the proof for the purpose is not sufficient in this case, and, subject to the general charge in that behalf, the point is refused. [5]

3. That to alter, modify or change the written agreement of May 24, 1889, by any alleged parol agreement, such parol agreement must be established by the testimony of two witnesses, or by one witness corroborated by circumstances equivalent to another, and there being no such evidence in this case, the verdict must be for the defendants. *Answer:* The rule as to corroborative evidence is correctly stated in the point, but we cannot say that the corroborative circumstances are insufficient, and it

is refused, under the principles we have stated in that behalf, in our general charge. [6]

10. Even if the evidence established the alleged parol agreement there can be no recovery in this case, as the plaintiff's own testimony shows the defendants kept the terms and conditions thereof, as claimed by plaintiff, by advancing to him twenty-five to thirty thousand dollars. *Answer:* If the jury should find that was the parol agreement, and such advancement was made, and this was all that was to be advanced, and there was no violation of the agreement on the part of the defendants, then this point is affirmed. This is the question for the jury, and that is answered subject to the principles stated in this behalf in our general charge. [7]

12. If the court should be of the opinion that there is evidence here from which the jury would be warranted in finding that the alleged parol agreement was entered into, yet there being no evidence of any demand by the plaintiff upon the defendants for advancements under such parol contract beyond what the plaintiff's own testimony shows had been furnished him, the plaintiff has failed to establish a breach of such contract and he cannot recover thereunder. *Answer:* If there was the alleged parol agreement for the advancement, it would not be necessary for the plaintiff to demand it if the defendants had notified the plaintiff they would no longer make such advancements. [8]

14. Under all the evidence in this case the verdict must be for the defendants. *Answer:* This would be taking the case from the jury, and we have thus far refused to do so. [9]

Verdict and judgment for plaintiff for $2,931.91. Defendants appealed.

*Errors assigned* among others were (2, 4–9) above instructions, quoting them.

*J. N. Banks* and *A. A. Stevens,* with them *E. Walker Smith, G. L. Owens* and *W. L. Pascoe,* for appellants.—Where parties without fraud or mistake have deliberately put their engagements in writing, the law declares the writing to be, not only the best, but the only evidence of their engagement: Martin v. Berens, 67 Pa. 459; Thorne, McFarlane & Co. v. Warfflein, 100 Pa. 519; Clarke v. Allen, 132 Pa. 40; Ziegler v. McFar-

land, 147 Pa. 607; Irvin v. Irvin, 169 Pa. 529; Phillips v. Meily, 106 Pa. 536; Hoffman v. R. R., 157 Pa. 174.

Before the plaintiff could bring his case within the exceptions to the rule, and offer evidence of fraud or mistake, it was essential he should distinctly and specifically allege fraud or mistake, in his statement of claim: Franks v. Groff, 14 S. &. R. 181; Clark v. Partridge, 2 Pa. 13; Hunter & Springer v. McHose, 100 Pa. 38; Merriman v. Bush, 116 Pa. 276; Wodock v. Robinson, 148 Pa. 503; Barndollar v. Tate, 1 S. & R. 160; Act of May 25, 1887, P. L. 271; Fritz v. Hathaway, 135 Pa. 274; Winkleblake v. Van Dyke, 161 Pa. 5; Murphy v. Taylor, 173 Pa. 317.

The evidence of fraud or mistake ought to be of what occurred at the execution of agreement: Stine v. Sherk, 1 W. & S. 195; Hoffman v. R. R., 157 Pa. 196; Vollmer v. Magowan, 180 Pa. 110.

*Frank Keener*, with him *Winslow & Calderwood, Samuel Cunningham, John S. Fisher* and *M. C. Watson*, for appellee.— It was not contended by the plaintiff in his pleadings or on the trial of the case that the contemporaneous oral agreement was omitted from the written agreement by reason of fraud, accident or mistake, but that defendants violated the contemporaneous oral agreement by standing on the written agreement as containing the whole contract, and by refusing to carry out the terms of the contemporaneous oral agreement: Lippincott v. Whitman, 83 Pa. 244; Cullmans v. Lindsay, 114 Pa. 166.

It is necessary that the contemporaneous parol agreement be proved by the testimony of two witnesses, or by that of one witness corroborated by circumstances equivalent to another, and that the testimony be clear, precise and indubitable. It is the duty of the judge to say whether the testimony has reached the legal standard, and if it has, it is then a question for the jury. The learned court, in a clear and exhaustive opinion of the law and the facts, decided that plaintiff's testimony came within the rule laid down as above, and thus submitted the question to the jury.

OPINION BY MR. JUSTICE McCOLLUM, May 26, 1898:

There was no violation by the defendants of any of the pro-

visions of the written contract between the parties. All the work to be done by the plaintiff under the contract was clearly defined therein, and so was the compensation he was to receive from the defendants for the performance of it. The compensation was measured by the quantity of logs and bark delivered and the stipulated price for cutting, peeling and delivering the same. Payments were to be made on account of it from month to month as the work progressed, reserving however to the defendants the right to retain twelve per cent of the compensation until the completion of the contract. To avoid misapprehension it was stipulated that all the work preliminary to the cutting, peeling and delivering of the logs and bark should be done by and at the cost of the plaintiff, except the sawing of the lumber necessary for the rails and plank for tramways and lumber for a stable, which work was to be done by the defendants without charge to him. It is not necessary to specify in detail all the terms of the written contract because the plaintiff's suit is not based on it but upon the alleged breach of an alleged oral agreement by which he says he was induced to sign the contract as written. It was therefore essential that the plaintiff, in order to maintain his suit, should establish by clear, precise and indubitable evidence, the alleged oral agreement and the terms thereof together with its relation to and agency in the creation of the written contract. It was also essential to the plaintiff's recovery that he should not only establish the oral agreement by the kind of evidence above defined, but that he should show by competent and satisfactory evidence a breach of it.

The plaintiff averred in his statement of claim that he was induced to sign the written contract " by a contemporaneous oral agreement of the defendants that they would furnish him the necessary capital and means to open up the forest, erect buildings, camps, slides, tramroads, skidways, trucks, bracket dams, and to clear out the stream for the purpose of floating logs," and that they would also furnish him " horses, all necessary camp equipments, hay, feed, supplies, money and means for the purpose of cutting, peeling, skidding and delivering said logs in dam, and bark on side track, and to carry forward the work under said contract until by his earnings therein the defendants were repaid such advancements, and he was enabled to fulfil the written contract." To sustain this averment the

plaintiff relies on his own testimony and his indebtedness to the defendants arising from their monthly payments to him of more than the written contract called for. These payments extended over a period of five years and included the twelve per cent which the defendants were authorized by the contract to retain until its completion.

It seems to have been conceded by the plaintiff that at the end of the above stated period he was indebted to the defendants on account of these payments in the sum of $11,054.23, and it appears that he was then unable to complete his contract if the defendants refused to increase his indebtedness to them by advances of money they were not bound by their written contract to make. They were unwilling to make such advances and, because of his inability to finish the work he had undertaken to do, they were compelled to assume the performance of it. Their refusal to increase his indebtedness to them constitutes the alleged breach of the alleged oral agreement on which this action is founded.

The plaintiff's evidence in relation to the alleged oral agreement is not convincing or satisfactory. He testified that he made it with Wray in the presence of Glunt on May 21, 1889, and that when the parties met at Bellwood on the 24th of the same month, for the purpose of reducing their entire agreement to writing it was understood between them that what he now designates as the oral agreement was an essential element or part of it, without which he would not sign it. He also testified in substance that the alleged oral agreement required Isett & Wray to furnish him the capital he needed to carry on the work specified in that part of his statement of claim above quoted, and that the capital so furnished was to be returned to them from his surplus earnings under the contract. In other words they were bound by the oral agreement to loan him from twenty to thirty thousand dollars as he might call for it to carry on the work he had expressly agreed to do at his own cost, and that they were bound to do this without assurance of repayment of the loan other than that contained in his promise to repay it when he should be able to do so. It matters not whether the money and supplies to be furnished under the alleged oral agreement are called advancements or loans, as they would, when furnished, certainly create and constitute a debt of the

plaintiff to the defendant, and according to the plaintiff's construction of said agreement it is possible that the debt created under it might exceed his estimate of the advancement or loan required for the performance of the work specified in it.

The testimony of Antes is claimed by the plaintiff as corroborative of his own testimony respecting an oral agreement. We cannot so regard it. The material part of it appears in the charge of the learned trial judge, and the inclusion of it in this opinion is unnecessary. It contains no allusion to an oral agreement, and nothing which is substantially at variance with the contract as written. If it be conceded that Antes had, in June, 1889 and in January, 1893, the conversations with Wray that he testified to, it must also be conceded that it would severely tax human ingenuity to discover in them any corroboration of the testimony of the plaintiff in support of his claim of an oral agreement with the defendants which materially modified the written contract between them.

Against the testimony of the plaintiff in relation to the alleged oral agreement on which the suit is based, we have the clear and positive testimony of Wray that such an agreement was not entered into or suggested, the equally positive and clear testimony of Isett that he and the plaintiff and Wray met at Bellwood on May 24, and there discussed and carefully considered and agreed upon all the terms and details of their contemplated contract, and that it was then and there reduced to writing, read over, and signed by all the parties to it; that this was the only contract or agreement between them, and that the first notice he had of such an agreement as the plaintiff now sets up, or of any proposition or request in accord with it, was after the institution of this suit. We have also the testimony of Glunt in which it plainly appears that no such agreement as is testified by the plaintiff was made in his presence or hearing at any time.

We have already referred to the monthly payments which exceeded in amount the payments called for by the written contract, and to the plaintiff's reliance upon them as corroborative of his testimony in support of his claim. The undisputed testimony of the defendants in relation to these payments deprives them of any corroborative force, and to them the decision of this court in Yeisley v. Bundel, 1 Monaghan, 67, is applicable. In that case as in this the plaintiff sought to modify a written con-

tract by a contemporaneous parol agreement, and to corroborate his own testimony in relation to the latter by showing payments on the former in excess of the amount called for therein. The payments were not allowed the effect claimed for them, and Mr. Justice GREEN, delivering the opinion of the Court, said: "The fact that the defendant paid more than the contract called for proves nothing. He might well do so in order to get his house completed. That is the explanation he gives of it, and it quite meets and accounts for the fact itself." We are unable to find in the letters from the defendants to the plaintiff or in the letter from them to his employees any corroboration whatever of the testimony of the plaintiff concerning the alleged oral agreement. The letter of June 3, 1892, was evidently thought by the plaintiff to have some corroborative force, but while it was admitted in evidence the learned trial judge said of it: " We have read this (the letter) over carefully and read it with reference to the stipulation in the article of agreement that they (the defendants) were to pay monthly, and while we submit it to you, we submit it with the remark that we are not entirely clear that this is an item of corroboration of the alleged parol agreement, for we find it entirely consistent with the written stipulation in the contract to pay monthly, but we will submit the matter to you with this observation." It should not have been admitted for the purpose above stated, and the same may be said of most if not all of the corroborative evidence so-called.

On a careful reading and consideration of the testimony, and with special reference to that part of it which is supposed by the plaintiff to strengthen his main contention, we are convinced that it does not rise to the standard of proof which the law exacts in order to set aside or modify a written contract by a contemporaneous parol agreement. The decisions on this point are numerous and they are so familiar to the profession that it is not considered necessary to quote from or cite them. As our conclusion is adverse to the main contention of the plaintiff the matters subordinate or incident to it require no discussion or consideration.

Judgment reversed.